Nathan Pogue, OR Bar No. 164611
    npogue@bittner-hahs.com
BITTNER HAHS POSTMAN SWAN
4949 Meadows Road, Suite 260
Lake Oswego, OR 97035
(503) 228-5626

David Cortman, AZ Bar No. 029490*
    dcortman@ADFLegal.org
Ryan Tucker, AZ Bar No. 034382*
    rtucker@ADFLegal.org
Jeremiah Galus, AZ Bar No. 030469*
    jgalus@ADFLegal.org
Mark Lippelmann, AZ Bar No. 036553*
    mlippelmann@ADFLegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

*Attorneys for Plaintiff*
*\*Admitted Pro Hac Vice*

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| YOUTH 71FIVE MINISTRIES, | Case No.:  1:24-cv-00399-CL |
| Plaintiff, | |
| v. | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |
| CHARLENE WILLIAMS, Director of the Oregon Department of Education, in her individual and official capacities; BRIAN DETMAN, Director of the Youth Development Division, in his individual and official capacities; and CORD BUEKER, JR., Deputy Director of the Youth Development Division, in his individual and official capacities, | REQUEST FOR ORAL ARGUMENT |
| | EXPEDITED HEARING REQUESTED |
| Defendants. | |

# TABLE OF CONTENTS

Table of Authorities ......................................................................................... ii

Motion ............................................................................................................... 1

Introduction ...................................................................................................... 2

Factual Background ......................................................................................... 3

    A.  71Five Ministries ................................................................................ 3

    B.  71Five's employees and volunteers ................................................... 4

    C.  Oregon's Youth Community Investment Grant Program ................... 7

    D.  71Five's successful 2023-25 grant applications and awards ............ 8

    E.  Defendants strip 71Five Ministries of its grant awards ................. 10

Legal Standard ............................................................................................... 11

Argument ........................................................................................................ 12

    I.  71Five Ministries is likely to succeed on the merits of its claims .................. 12

    A.  Defendants violate the Free Exercise Clause ................................. 12

        1.  Defendants' decision to exclude the ministry because of its religious character and exercise triggers strict scrutiny under *Trinity Lutheran*, *Espinoza*, and *Carson* .............................. 12

        2.  Defendants' exclusionary rule also triggers strict scrutiny because it is not neutral or generally applicable. ................................ 15

        3.  Defendants cannot satisfy strict scrutiny. ............................. 17

    B.  Excluding the ministry because it selects coreligionists violates the church autonomy doctrine ............................................................ 18

        1.  Defendants' rule violates the ministerial exception. ............. 19

        2.  Defendants' rule violates the broader church autonomy doctrine. ...... 20

    C.  Excluding the ministry because it selects coreligionists also violates its right to expressive association ................................................. 21

    II.  The Ministry satisfies the other preliminary injunction factors. .................. 23

Conclusion ...................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) ................................................................ 24

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ...................................................................... 21, 22

*Bryce v. Episcopal Church in the Diocese of Colorado,*
    289 F.3d 648 (10th Cir. 2002) .............................................................. 21

*Carson v. Makin,*
    596 U.S. 767 (2022) ........................................................ 3, 12, 13, 15, 17

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................ 15, 16, 17

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...................................................................... 22, 23

*Community House, Inc. v. City of Boise,*
    490 F.3d 1041 (9th Cir. 2007) .............................................................. 25

*Corporation of Presiding Bishop v. Amos,*
    483 U.S. 327 (1987) ...................................................................... 20, 21

*Doe v. Harris,*
    772 F.3d 563 (9th Cir. 2014) ............................................................... 25

*Drakes Bay Oyster Company v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) .............................................................. 24

*Elrod v. Burns,*
    427 U.S. 347 (1976) .......................................................................... 23

*Espinoza v. Montana Department of Revenue,*
    140 S. Ct. 2246 (2020) .................................................................... 3, 13

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ................................................... 15, 16, 17, 18, 23

*Hall v. United States Department of Agriculture,*
    984 F.3d 825 (9th Cir. 2020) ................................................................ 11

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012) ................................................................ 19, 20, 22

*Index Newspapers LLC v. City of Portland,*
    480 F. Supp. 3d 1120 (D. Or. 2020) ................................................ 24, 25

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,*
    344 U.S. 94 (1952) ................................................................................ 18

*LeBoon v. Lancaster Jewish Community Center Association,*
    503 F.3d 217 (3d Cir. 2007) .................................................................. 14

*Mobilize the Message, LLC v. Bonta,*
    50 F.4th 928 (9th Cir. 2022) ........................................................... 11, 23

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ..................................................................... 19, 20

*Riley's American Heritage Farms v. Elsasser,*
    32 F.4th 707 (9th Cir. 2022) .................................................................. 24

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ................................................................................. 2

*Slattery v. Hochul,*
    61 F.4th 278 (2d Cir. 2023) ................................................................... 22

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ......................................................... 3, 12, 13, 14, 15

*Winter v. National Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................. 11

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................. 2

**Statutes and Rules**

Fed. R. Civ. P. 65 ..................................................................................... 1

Local Rule 7-1(a)(1)...................................................................................................... 1

O.R.S. § 659A.006(4) ......................................................................................... 2, 17, 18

42 U.S.C.A. § 2000e-1(a) .................................................................................. 2, 17, 18

## <u>MOTION</u>

Plaintiff Youth 71Five Ministries ("71Five Ministries" or "71Five") moves this Court under Fed. R. Civ. P. 65 to issue a preliminary injunction:

1. Reinstating the 2023-25 Youth Community Investment Grants previously awarded to 71Five;

2. Enjoining Defendants from requiring 71Five to agree with or abide by their newly-adopted nondiscrimination requirement ("New Rule") as a condition to participate in the Youth Community Investment Grant Program, to the extent that the New Rule would prohibit 71Five from preferring employees and volunteers who share its faith; and

3. Enjoining Defendants from terminating, rescinding, or refusing to enter into any future contracts or agreements with 71Five related to the Youth Community Investment Grant Program, because of 71Five's religious character or exercise, including its religious exercise of only hiring employees and working with volunteers who share its faith.

This motion is supported by the Verified Complaint, ECF No. 1 ("VC"), and its Exhibits, the Declaration of Bud Amundsen ("Amundsen Decl."), and the Memorandum in Support below. In compliance with Local Rule 7-1(a)(1), Plaintiff's counsel made a good faith effort through telephone conferences to resolve the dispute and was unable to do so. Defendants oppose this motion.

**INTRODUCTION**

This case is about state officials' sudden exclusion of a religious ministry from a grant program—after years of successful partnership—simply because it requires employees and volunteers to share its faith. For 60 years, Youth 71Five Ministries ("71Five Ministries" or "71Five") has served Oregon families by mentoring at-risk youth and teaching them about the Christian faith through likeminded employees and volunteers. The Oregon Department of Education ("the Department") operates a grant program to support organizations serving at-risk youth and has awarded many grants to 71Five Ministries. And for good reason: the ministry has submitted top-ranking grant applications and has a proven record of effectively working with youth and community partners.

During the most recent grant cycle, the Department awarded 71Five multiple grants worth over $400,000. But Defendants suddenly reversed course and stripped the ministry of its grants. Why? Because Defendants changed the rules to prohibit faith-based organizations from participating in the program if they prefer members of their own faith as employees and volunteers ("New Rule"). Like many religious organizations, 71Five Ministries must prefer members of its own faith to advance its religious mission and message. And the law protects its right to do so. *See* U.S. Const. amend. I; *see also* 42 U.S.C. § 2000e-1(a) (religious exemption from Title VII); O.R.S. § 659A.006(4) (religious exemption from Oregon's employment nondiscrimination law).

Defendants' exclusion is unlawful and counterproductive. Sixty years ago, the Supreme Court recognized that "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). The

Supreme Court has reiterated that point three times in the last seven years, emphasizing that a state cannot force a religious organization to choose between its religious character and exercise and participating in a government program. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020); *Carson v. Makin*, 596 U.S. 767, 778–80 (2022). Because Defendants put the Ministry to that very choice—and stripped it of grant awards—a preliminary injunction should issue.

## FACTUAL BACKGROUND

### A.    71Five Ministries

Youth 71Five Ministries is a Christian, nonprofit youth-mentoring ministry that has served the Rogue Valley community for 60 years. Amundsen Decl. ¶¶ 3–5. Its name comes from Psalm 71:5, which proclaims: "Lord God, you are my hope. I have trusted you since I was young." *Id.* ¶ 6. Inspired by this theme verse, 71Five Ministries believes that when a young person learns to trust in God, he or she will experience a lifetime of hope. *Id.* ¶ 7. Its mission statement confirms that the ministry "exists to share God's Story of Hope with young people through trusting relationships in any relevant way." *Id.* ¶ 11.

71Five Ministries accomplishes this mission by connecting with young people and their families through a wide range of voluntary programs that provide social interaction, vocational training, and meaningful relationships, all while emphasizing the importance of having a relationship with Jesus Christ. *Id.* ¶ 13. The ministry shares its faith and hope mainly through the supportive and trusting personal relationships that develop between youth and its employees or volunteers. *Id.* ¶¶ 9–16. While the ministry meets physical, mental, emotional, and social needs

through its various programs and ministries, its "primary purpose" is "to teach and share about the life of Jesus Christ" so that students "might have an opportunity of having a personal relationship" with Him. *Id.* ¶ 15. And while 71Five exists to advance a Christian mission and message, the ministry serves people of all faiths and backgrounds, and it does not require attendance or participation in any religious activities as a condition to receiving services. *Id.* ¶ 70.

### B.    71Five's employees and volunteers

Given its emphasis on one-to-one mentoring and developing authentic, trusting relationships, 71Five Ministries depends on its staff and volunteers to faithfully teach and model the Gospel. *Id.* ¶¶ 16, 18. The ministry currently has about 30 employees and over 100 volunteers. *Id.* ¶ 17. Because 71Five believes that all board members, employees, and volunteers influence the organization and the young people in its care, it expects them to share its faith and "to be authentic followers of Christ, manifesting by precept and example the highest Christian virtue and personal decorum." *Id.* ¶¶ 18–20.

All employees, volunteers, and board members therefore must "subscribe and adhere without mental reservation" to the following Statement of Faith, which reflects the beliefs of historical Christianity:

(1) We believe the Bible to be the inspired, infallible, authoritative and complete word of God.

(2) We believe that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit.

(3) We believe in the deity of our Lord Jesus Christ, in His virgin birth, in His sinless life, in His miracles, in His vicarious and atoning death through his shed blood, in His bodily resurrection, in His ascension to the right hand of the Father, and in His personal return to power and glory.

(4) We believe that, for the salvation of lost and sinful man, regeneration by the Holy Spirit is absolutely essential.

(5) We believe in the present ministry of the Holy Spirit by whose indwelling the Christian is enabled to live a godly life.

(6) We believe in the resurrection of both the saved and lost; they that are either saved unto the resurrection of life, or are lost unto the resurrection of damnation.

(7) We believe in the spiritual unity of believers in Christ.

*Id.* ¶ 21.

All employees, volunteers, and board members must also be actively involved in a local church and are expected to encourage the students and families that they serve to be involved in a local church too. *Id.* ¶¶ 22–23. The ministry believes that a "Christian lifestyle should reflect the biblical perspective of integrity, including but not limited to: appropriate personal and family relationships; business conduct; moral behavior; and use of discretion in areas of personal liberty with a mind to encourage the Christian walk of others." *Id.* ¶ 24. The importance of having employees who share and live out its religious beliefs is also evidenced by the ministry's various job descriptions:

- The Executive Director must "direct the entire program of 71Five," be "the embodiment of 71Five in the local community," and "maintain on all levels, the character of a sincere and mature Christian;"

- Coordinators of 71Five's various ministries must "[d]evelop[ ] recurrent programs that communicate the Gospel, teach life skills, and encourage healthy lifestyles," "[w]ork with local churches," "[p]rayerfully assign appropriate mentors to young people," and "[e]stablish trusting, Christ-sharing relationships" with students;

- The Development Director is expected to "foster relationships" with "local churches," connect with potential donors "through phone calls and face to face appointments," and "present[ ] the story of 71Five at churches, community events, [and] service organization meetings,"

- The Marketing Coordinator must "[d]evelop creative ways to improve campaigns, grow the 71Five brand, [and] communicate the mission of 71Five;"

- The VoTech Case Manager is expected to "[e]stablish trusting, Christ-sharing relationships will all VoTech students;" and

- An Administrative Specialist is often called to be the Ministry's first point of contact with the public, representing the ministry "at the front desk," receiving and screening "all incoming phone calls," and greeting "all people entering the office."

*Id.* ¶ 27.

On top of the job duties of any particular position, *all* employees must fulfill "Core Responsibilities," including  "communicat[ing] and introduc[ing] the Gospel of Jesus Christ to young people and their families"; "[s]eek[ing] God's guidance and wisdom, through prayer and meditation, for the organization as well as for specific ministry initiatives"; being "prepared to share the Gospel, offer guidance, comfort and pray to meet the spiritual needs of those you encounter in your day-to-day activities"; and actively "[p]articipat[ing] in regular times of prayer, devotion, and worship." *Id.* ¶ 28. 71Five also relies heavily on volunteers to fulfill its religious mission by mentoring students, leading prayers and devotionals, and providing staff with spiritual support and encouragement, among other things. *Id.* ¶¶ 29–32.

By requiring all board members, employees, and volunteers to share and live out its religious beliefs, 71Five Ministries maintains a community of likeminded individuals who can compellingly articulate and advance its Christian messages and beliefs to youth, parents, and the broader community. *Id.* ¶ 33. Keeping an

Motion for Preliminary Injunction          6

internal community of coreligionists also facilitates discipleship among board members, employees, and volunteers, creating a place of Christian fellowship. *Id.* ¶¶ 34–36. This supportive Christian environment is one big reason employees want to work there and why many volunteers choose to donate their time and resources to the ministry. *Id.* ¶ 36.

### C.    Oregon's Youth Community Investment Grant Program

The Oregon Department of Education, through its Youth Development Division, provides biennial Youth Community Investment Grants to eligible organizations that serve youth ages 6 to 24 who are at risk of disengaging from school, work, and community. *Id.* ¶¶ 37–38. The grant program includes four initiatives: (1) Youth Promise; (2) Youth Workforce Readiness; (3) Youth Solutions; and (4) Youth Violence and Gang Prevention. *Id.* ¶ 39.

The Youth Promise initiative is intended to support youth ages 6 to 24 by providing funds for existing programs that help improve and sustain engagement in education and the workforce so that youth may realize their potential. *Id.* ¶ 40. The Youth Workforce Readiness initiative supports programs providing youth ages 14 to 24 with career exploration and skill development services leading to living-wage work opportunities. *Id.* ¶ 41. The Youth Solutions initiative supports youth ages 6 to 24 with risk factors leading to negative outcomes. *Id.* ¶ 42. And the Youth Violence and Gang Prevention initiative supports youth ages 12 to 24 at risk of committing or being victims of violent crime. *Id.* ¶ 43.

71Five Ministries has applied for, and been awarded, many Youth Community Investment Grants. *Id.* ¶ 44. It received an award during the 2017-19 grant cycle, three grant awards during the 2019-21 grant cycle, and three more during the 2021-23 grant cycle. *Id.* ¶ 45. In fact, the ministry had the top-rated

application for the Youth Violence and Gang Prevention grant during the 2021-23 cycle. *Id.* ¶ 46. Consistent with the terms of the program, 71Five used these awards to provide support and assistance to youth, to purchase needed supplies and equipment, and to partially cover personnel and operating costs. *Id.* ¶ 47.

### D.    71Five's successful 2023-25 grant applications and awards

When the Department announced its 2023-25 grant cycle, 71Five Ministries again applied for a Youth Promise grant and a Youth Violence and Gang Prevention grant. *Id.* ¶¶ 48–59. As with prior grants, the grants requested for the 2023-25 cycle would help provide direct support and assistance to youth, purchase needed supplies and equipment, and partially cover personnel and operating costs. *Id.* ¶ 60.

The ministry's Youth Promise application sought a $220,000 grant to support its youth centers in West Medford. *Id.* ¶¶ 50, 53. The application noted that 71Five has a proven track-record of success and explained that its youth centers help at-risk youth by providing them with free mentoring, education support, and recreational activities, among other things. *Id.* ¶ 52. Apart from seeking funding for its youth centers, $80,000 of the requested $220,000 was intended for two separate (and secular) nonprofit organizations, LIFE Art and Familia Unida, both of which "share a common interest in improving the emotional, social, and cognitive competencies of West Medford youth." *Id.* ¶ 54. The application explained that the ministry provides those organizations with free space in one of its youth centers and that it could keep doing so if the requested grant were awarded. *Id.* ¶ 55.

The ministry's Youth Violence and Gang Prevention application sought a $120,000 grant to support its "Break the Cycle" program designed to serve youth with juvenile corrections and gang involvement, as well as youth who have committed or are victims of crime. *Id.* ¶¶ 56–59. The Community Justice

Department of Jackson County submitted a letter in support of 71Five's application, touting the ministry's "proven track record of effectively working with both community partners and youth." *Id.* ¶ 58.

Although 71Five Ministries had been awarded prior grants under the Youth Community Investment Grant Program, Defendants altered the 2023-25 grant terms to prohibit faith-based organizations from participating in the program if they prefer members of their own faith as employees and volunteers ("New Rule"). *Id.* ¶ 62. The 2023-25 grant application required applicants to check a box certifying that they "do[ ] not discriminate in [their] employment practices, vendor selection, subcontracting, or service delivery with regard to . . . religion." *Id.* ¶ 63. The New Rule was not included in prior grant cycles. *Id.* ¶ 65.

71Five Ministries first learned about the New Rule while filling out its 2023-25 applications, and for two reasons, it decided to check the box certifying that it does not "discriminate." *Id.* ¶¶ 66–67. First, the ministry had no other choice; if it did not check the box on the electronic-only form, the application would be "considered non-responsive" and would "not be considered further." *Id.* ¶ 68. Second, 71Five Ministries *doesn't* discriminate in vendor selection, subcontracting, or service delivery, and any distinctions it makes for employees and volunteers are legally protected. *Id.* ¶ 69. Indeed, the ministry serves people of all faiths and backgrounds and does not require attendance or participation in any religious activities as a condition to receiving services. *Id.* ¶ 70.

After submitting the applications, the Department notified the ministry in July 2023 that it had been selected to receive two grants totaling $340,000—a $220,000 Youth Promise grant and a $120,000 Youth Violence and Gang Prevention grant. *Id.* ¶ 71. 71Five Ministries also learned that it would receive an additional

$70,000 as a subgrantee to a grant awarded to another organization. *Id.* ¶ 72. Out of 81 grants awarded during this cycle, however, the ministry was one of just five faith-based organizations selected. *Id.* ¶ 73. And because the other four do not require their employees and volunteers to share their faith or religious beliefs, 71Five Ministries was the only recipient that had its grants taken away. *Id.* ¶¶ 74–75.

### E.    Defendants strip 71Five Ministries of its grant awards

In October 2023, a Department official unexpectedly emailed 71Five's Executive Director and told him that the ministry was being disqualified because of its practice of only hiring employees and working with volunteers who share its religious beliefs. *Id.* ¶ 76. That email, which copied Defendant Brian Detman, stated that the 2023-25 grant application included the New Rule and that 71Five was disqualified because it "requires all staff and volunteers to affirm a 'Statement of Faith'" and asks applicants to "discuss their 'Church' affiliation and attendance." *Id.* ¶¶ 77–78. The Executive Director immediately responded, noting that the ministry "does not discriminate in any way except as protected by law," explaining that it is important to align staff and volunteers with the ministry's religious mission, and affirming that the ministry has always "been clear on this point in [its] interactions with [Department] staff." *Id.* ¶¶ 79–80.

The Department did not follow up until more than a month later, in November 2023, and even then, it simply confirmed that 71Five Ministries was being disqualified because of its religious practices. *Id.* ¶¶ 81–82. The Department official reiterated that the Department would "not proceed" with the grants and said the decision was "final." *Id.* ¶ 82. The Executive Director of 71Five again questioned the legality of the decision, asking the official to explain how the Department "is not

discriminating against [it] as a protected religious organization" by requiring it to certify that it does not consider religion when making employment decisions. *Id.* ¶ 83. A Department official responded by saying "the original termination of the award stands." *Id.* ¶ 84.

A month later, Defendant Bueker confirmed that it was indeed "the decision of ODE/the state" to rescind the ministry's awards. *Id.* ¶ 85. Yet the day before Defendant Bueker sent this confirmation email, Youth Development Division staff—including Defendants Detman and Bueker—acknowledged at a quarterly meeting of the Youth Development Council that it was rare for the Department to rescind a grant award. *Id.* ¶ 86.

Besides losing $340,000 in Youth Community Investment Grants directly awarded to it, the Ministry also lost the additional $70,000 that it was set to receive as a subgrantee because Defendants determined that it was "also ineligible to receive state funds as a subgrantee or subcontractor to another organization receiving state funds." *Id.* ¶¶ 88–89.

## LEGAL STANDARD

A party moving for a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 934 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Likelihood of success is "determinative" in First Amendment cases, so courts typically "confine [their] analysis to that factor." *Id.* (citing *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 835 (9th Cir. 2020)).

## ARGUMENT

### I.    71Five Ministries is likely to succeed on the merits of its claims.

Defendants' decision to exclude 71Five Ministries and rescind its grant awards violates the Free Exercise Clause, the church autonomy doctrine, and the Free Speech Clause of the First Amendment. The ministry is likely to succeed on the merits of one or more of its claims.

#### A.    Defendants violate the Free Exercise Clause.

Defendants' exclusionary policy triggers—and fails—strict scrutiny under the Free Exercise Clause for two reasons. *First*, the New Rule excludes applicants from a public benefit just because of their religious character and practice. *Second*, the New Rule is neither neutral nor generally applicable because it targets faith-based organizations like 71Five Ministries and allows for individualized exceptions.

##### 1.    Defendants' decision to exclude the ministry because of its religious character and exercise triggers strict scrutiny under *Trinity Lutheran*, *Espinoza*, and *Carson*.

The Free Exercise Clause "protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson*, 596 U.S. at 778 (quotation omitted). For this reason, the Supreme Court has "repeatedly held" that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits" because of their "religious character" or "religious exercise." *Id.* at 778–81 (cleaned up).

The Supreme Court reiterated this point three times within the last decade. First, in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, the Court held that Missouri's exclusion of churches from a playground resurfacing grant program violated the Free Exercise Clause because it disqualified otherwise-eligible recipients "from a public benefit solely because of their religious character," thereby

imposing a "penalty on the free exercise of religion that trigger[ed] the most exacting scrutiny." 582 U.S. at 462.

Again, in *Espinoza v. Montana Department of Revenue*, the Court struck down the Montana constitution's no-aid provision because it barred religious schools from participating in the state's scholarship program "solely because of the religious character of the schools." 140 S. Ct. at 2255. The Court explained that when a state decides to "subsidize private education," it cannot then "disqualify some private schools solely because they are religious." *Id.* at 2261.

And finally, in *Carson v. Makin*, the Court held that Maine could not exclude religious private schools from the state's tuition assistance program. 596 U.S. at 788–89. Trying to avoid *Trinity Lutheran* and *Espinoza*, Maine argued it did not exclude religious schools based on religious *status*, but excluded schools based on religious *use* because "a school is excluded only if it promotes a particular faith and presents academic material through the lens of that faith." *Id.* at 787. The Court rejected that argument, noting that the very reason religious schools exist is to teach their faith. *Id.* "Any attempt to give effect to such a distinction," the Court continued, would raise serious constitutional concerns. *Id.* It thus concluded that "the prohibition on status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination." *Id.* at 788.

*Trinity Lutheran*, *Espinoza*, and *Carson* decide this case. The State cannot subsidize private programs serving at-risk youth but then exclude otherwise eligible organizations because of their religious character or exercise. *Carson*, 596 U.S. at 787. Yet that is precisely what the New Rule does.

Religious organizations everywhere expect their employees and volunteers to share their religious beliefs and mission—indeed, that feature is part of what makes

them *religious. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (one factor for whether an organization qualifies as "religious" is "whether its membership is made up by coreligionists"). But Defendants' New Rule requires all applicants to check a box on an all-electronic form certifying that they "do[ ] not discriminate in [their] employment practices … with regard to … religion." Amundsen Decl. ¶ 63. If an applicant does not check the box, Defendants deem the application "non-responsive," and the application will "not be considered further," *Id*. ¶ 68, and thereby denied. Even though 71Five Ministries was otherwise eligible to receive grants—and in fact *did* receive multiple awards for past and present grant cycles—Defendants cited this exclusionary policy to rescind the ministry's grant awards. *Id.* ¶¶ 77–78, 81. Because Defendants exclude the ministry based solely on its religious character and exercise, they violate the Free Exercise Clause and trigger strict scrutiny.

Nor is it a defense to say that 71Five could participate if it simply changed its beliefs and policies to accept employees and volunteers who do not share—or even oppose—its faith. Like the unconstitutional exclusion in *Trinity Lutheran*, the New Rule puts the ministry to an impossible choice: "It may participate in an otherwise available benefit program or remain a religious institution." *Trinity Lutheran*, 582 U.S. at 462. If it elects the latter, its "freedom [of religion] comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the [ministry] is otherwise fully qualified." *Id.* But "[t]o condition the availability of benefits … upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties." *Id.* (citation and alterations omitted).

Motion for Preliminary Injunction          14

By forcing 71Five Ministries to decide between faith or funding, the Department "penalizes the free exercise of religion" and engages in religious discrimination that is "odious to our Constitution." *Carson*, 596 U.S. at 779–80 (citations and quotations omitted). Defendants' actions and the New Rule "must withstand the strictest scrutiny." *Trinity Lutheran*, 582 U.S. at 463.

### 2. Defendants' exclusionary rule also triggers strict scrutiny because it is not neutral or generally applicable.

Defendants' actions trigger strict scrutiny for another reason: they substantially burden the ministry's religious exercise but are neither neutral nor generally applicable. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 532–33 (2021). A law is not neutral if its "purpose" or "object" is "the suppression of religion or religious conduct." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). And it is not generally applicable if it (1) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or (2) "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533–34 (cleaned up). "Neutrality and general applicability are interrelated," so a "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. Defendants fail this test for at least two reasons.

***System of Individualized Exemptions.*** When the government retains "discretion" to grant exemptions from its rules while also making clear that it "has no intention of granting an exception" to a plaintiff suffering religious hardship, the mere "system of individual exemptions" destroys general applicability and triggers

strict scrutiny. *Fulton*, 593 U.S. at 535. This is true "regardless [of] whether any exceptions have [actually] been given." *Id.* at 537.

Here, Defendants have discretion to create exceptions from grant terms, including the New Rule. For example, Defendants allow grant applicants to "negotiate some provisions of the final Grant" and give themselves unfettered discretion by not limiting which "terms and conditions" may be "reserved for negotiation." Amundsen Decl. ¶ 90. And if the Department receives only one grant application, it can "dispense with the evaluation process" entirely and immediately "proceed with Grant negotiations and award." *Id.* Because Defendants had the power to grant discretionary exemptions from the New Rule—but refused to do so for 71Five Ministries—their actions trigger strict scrutiny.

***Neutrality and Targeting.*** The requirement of neutrality "extends beyond facial discrimination" and "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Lukumi*, 508 U.S. at 534. "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.*

Here, the practical object and effect of the New Rule is to exclude applicants with coreligionist commitments while approving other applicants with beliefs that the government prefers. Indeed, Defendants awarded 81 grants for the 2023-25 cycle, including awards to four other faith-based organizations who do not share the 71Five Ministries' faith-based commitment to rely on coreligionists as employees and volunteers. Amundsen Decl. ¶¶ 74–75. And years of successful participation by 71Five shows that the Department's sudden reversal for the ministry—but not for any other religious organization—is not neutral. Because the New Rule caused only 71Five to lose its grant awards, "the effect of [the] law in its real operation" was to

single out the ministry's religious beliefs and practices for unfavorable treatment.
*Lukumi*, 508 U.S. at 535. Defendants' actions trigger strict scrutiny for this reason
as well.

### 3.    Defendants cannot satisfy strict scrutiny.

To satisfy strict scrutiny, Defendants' actions "must advance interests of the
highest order and must be narrowly tailored in pursuit of those interests." *Carson*,
596 U.S. at 780 (cleaned up). Defendants cannot rely on a "broadly formulated"
interest in "equal treatment" or in "enforcing its non-discrimination policies
generally," but must establish a compelling interest "in denying an exception" to
71Five Ministries in particular. *Fulton,* 593 U.S. at 541. Defendants cannot meet
this test.

*First*, Defendants lack any compelling interest in forcing 71Five Ministries to
choose between its religious character and exercise and participating in the grant
program. The Department previously awarded many grants to the ministry without
forbidding its preference for coreligionists, and the ministry has for years
successfully advanced the program's goals and purposes. Defendants can point to
nothing justifying the sudden exclusion. To the contrary, both federal and state law
require accommodation of 71Five's employment practices. Oregon's employment
nondiscrimination law, for instance, allows religious institutions "to prefer an
employee" of the same religion. *See* O.R.S. § 659A.006(4). And Title VII allows
religious organizations to prefer "individuals of a particular religion to perform
work connected with the carrying on . . . of its activities." 42 U.S.C.A. § 2000e-1(a).
What's more, the government has no legitimate interest—much less a compelling
one—in dictating who an organization must accept as *volunteers.*

Any purported interest is further undermined by Defendants' ability to hand out individualized exemptions on a case-by-case basis. As explained above, Defendants have unfettered discretion to depart from the grant terms when they wish—they are free to "negotiate" provisions of a final grant and can even "dispense with the evaluation process" altogether. *See* Amundsen Decl. ¶ 90. This "system of exceptions . . . undermines [the Department's] contention that its non-discrimination policies can brook no departures." *Fulton,* 593 U.S. at 542.

*Second*, the New Rule is not narrowly tailored. To begin, the New Rule goes beyond the employment context to dictate who religious organizations must accept as volunteers. And the New Rule sweeps so broadly that it forbids any preference for coreligionists regardless of whether the position is ministerial or non-ministerial. Both state and federal employment nondiscrimination laws show that there are less restrictive alternatives that advance the State's purported interests while respecting faith-based organizations' right to prefer coreligionists. O.R.S. § 659A.006(4); 42 U.S.C.A. § 2000e-1(a). Because the New Rule is not narrowly tailored to advance a compelling governmental interest, Defendants' exclusion of the ministry cannot withstand strict scrutiny.

### B.    Excluding the ministry because it selects coreligionists violates the church autonomy doctrine.

The First Amendment's Religion Clauses protect the autonomy of churches and religious organizations "to decide for themselves, free from state interference, matters of [internal] government." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). The New Rule violates the church autonomy doctrine in two ways: (1) by interfering with 71Five's right to

freely select *ministerial* employees and volunteers; and (2) by prohibiting the ministry from preferring coreligionists for *non-ministerial* positions.

### 1.    Defendants' rule violates the ministerial exception.

"The independence of religious institutions in matters of 'faith and doctrine'" requires "their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)). A central "component of this autonomy is the selection of the individuals who play certain key roles" in the ministry. *Id.* This so-called ministerial exception "foreclose[s] certain employment discrimination claims" because religious organizations may "select, supervise, and if necessary, remove" individuals who advance its mission and message "without interference by secular authorities." *Id.* at 2060–61.

The ministerial exception acquired its name because "ministers" happened to play the key roles in pioneering cases, but the rule is not limited to "ministers" or members of the clergy. *Id.* Although the Supreme Court has declined to adopt a rigid formula for deciding when an employee qualifies as a "minister," it has made clear that the exception includes employees whose "job duties reflected a role in conveying the [ministry's] message and carrying out its mission." *Id.* at 2062 (citing *Hosanna-Tabor*, 565 U.S. at 192.

Many of 71Five Ministries' employees and volunteers qualify as "ministers." The ministry relies on its board members, employees, and volunteers to advance its Christian mission and message. Amundsen Decl. ¶¶ 17–19. So it requires *all* of them to affirm its Statement of Faith and "to be authentic followers of Christ." *Id.* ¶¶ 20–26. Besides having religious leadership responsibilities in many position

descriptions, *id.* ¶ 27, all employees must fulfill religious "Core Responsibilities." *Id.* ¶ 28. These include "communicat[ing] and introduc[ing] the Gospel of Jesus Christ to young people and their families"; "[s]eek[ing] God's guidance and wisdom, through prayer and meditation, for the organization as well as for specific ministry initiatives"; being "prepared to share the Gospel, offer guidance, comfort and pray to meet the spiritual needs of those you encounter in your day-to-day activities"; and actively "[p]articipat[ing] in regular times of prayer, devotion, and worship." *Id.* Many volunteers likewise fulfill 71Five's religious mission by mentoring students, leading prayers and devotionals, and providing spiritual support and encouragement. *Id.* ¶¶ 29–32.

The New Rule violates the ministerial exception—and meddles in internal religious affairs—by excluding 71Five Ministries from the grant program unless it hires nonbelievers. Like the teachers in *Hosanna-Tabor* and *Our Lady*, the ministry's staff and volunteers are "entrusted with the responsibility of 'transmitting the [Christian] faith to the next generation.'" *Our Lady*, 140 S. Ct. at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 192). So Defendants cannot interfere with who may or may not fill those positions; the First Amendment "ensures that the authority to select and control who will minister to the faithful" is the ministry's "alone." *Hosanna-Tabor*, 565 U.S. at 194–95.

## 2. Defendants' rule violates the broader church autonomy doctrine.

Defendants' exclusion of 71Five Ministries violates the church autonomy doctrine in other ways too. Beyond the ministerial exception, the doctrine broadly protects the ministry's freedom to make "internal management decisions" like personnel selection. *Our Lady*, 140 S. Ct. at 2060. "Determining that certain activities are in furtherance of an organization's religious mission, and that only

those committed to that mission should conduct them," is a fundamental "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). The church autonomy doctrine includes the freedom to prefer coreligionists and make personnel decisions based on religious doctrine, even when position is non-ministerial. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657, 660 (10th Cir. 2002).

To the extent that any of 71Five Ministries' employees or volunteers do not qualify as "ministerial," the church autonomy doctrine still protects its right to prefer coreligionists because such preference is rooted in its religious beliefs and practices. *See id.* As explained above, all of 71Five's employees and volunteers play an active role in advancing its Christian mission and message. If the ministry were forced to accept employees and volunteers who reject its faith—as the New Rule requires—the ministry could no longer advance its mission or control its internal religious affairs. So the New Rule violates both the ministerial exception and the church autonomy doctrine more broadly.

### C.   Excluding the ministry because it selects coreligionists also violates its right to expressive association.

Defendants' decision to condition participation upon the forced inclusion of nonbelievers also infringes the ministry's First Amendment right "to associate with others in pursuit of … educational [and] religious … ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000).

This right to expressive association includes the "freedom not to associate" with people who "may impair the [group's] ability" to express its views. *Id.* at 647–48. So when an association expresses a collective message, the First Amendment prohibits the government from forcing the association to admit those who disagree with its message, seek to change that message, or express a contrary view. *Id.* The

right applies if (1) "the group engages in 'expressive association,'" and (2) "the forced inclusion" of a person "affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. 71Five Ministries satisfies both elements.

First, "[r]eligious groups" like 71Five "are the archetype of" expressive associations. *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring). Indeed, the ministry's Articles of Incorporation show that its "primary purpose" is "to teach and share about the life of Jesus Christ." Amundsen Decl. ¶ 15. And its mission statement confirms that the ministry "exists to share God's Story of Hope with young people." *Id.* ¶ 11. 71Five Ministries accomplishes this through likeminded staff and volunteers who affirm and communicate its faith through prayer, Bible study, and religious discussion. *Id.* ¶¶ 12–13, 16, 18.

Second, the New Rule and Defendants' actions force 71Five Ministries to expressively associate with people who do not hold the same religious views and thus cannot express the same message. Courts must "give deference to an association's view of what would impair its expression," *Dale,* 530 U.S. at 653, and the ministry here rightly believes that it can express its message "*only* through staff and volunteers who are willing and able to faithfully teach the Bible and relationally share the Gospel." Amundsen Decl. ¶ 16 (emphasis added).

Simply put, "[t]he right to expressive association allows [the ministry] to determine that its message will be effectively conveyed only by employees who sincerely share its views." *Slattery v. Hochul,* 61 F.4th 278, 288 (2d Cir. 2023). The New Rule and Defendants' actions violate his right and trigger strict scrutiny by compelling 71Five Ministries to hire employees (and accept volunteers) who reject or oppose its message. But as explained above, *supra* § I.A.3, Defendants cannot

withstand "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

## II.    The Ministry satisfies the other preliminary injunction factors.

In First Amendment cases like this, 71Five Ministries' likelihood of success on even one of its claims is "determinative" and the Court may "confine [its] analysis to that factor." *Mobilize the Message*, 50 F.4th at 934 (citation omitted). But the remaining preliminary injunction factors—irreparable harm, balance of equities, and public interest—also all favor an injunction.

***Irreparable Harm.*** "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). 71Five Ministries has already suffered irreparable harm and will continue to suffer without an injunction. It is enough that Defendants violate 71Five's constitutional rights by "putting it to the choice" of violating its religious beliefs or losing access to an otherwise-available grant program. *Fulton*, 593 U.S. at 532. Indeed, the ministry is otherwise eligible to receive awards, and it wishes to immediately resume its participation in the program and intends to apply for and participate in future grant programs. Amundsen Decl. ¶¶ 91–92. This constitutional violation is alone sufficient to establish irreparable harm.

The New Rule and Defendants' unconstitutional actions have caused other negative impacts on 71Five, further "curtailing its mission." *Fulton*, 593 U.S. at 532. Simply put, 71Five Ministries cannot get through the 2-year grant cycle without reducing its programs, staff, or both. Amundsen Decl. ¶ 97. As a direct result of Defendants' actions, 71Five staff have already had to take time away from mission-critical programs to focus on fundraising. *Id.* ¶ 96. This reduction of mission-critical

work will continue without an injunction. *Id.* And Defendants' actions will likely affect 71Five's ability to pay its employees, some of whom had their salaries partially funded by previous grants awarded by Defendants. *Id.* ¶ 98.

Defendants' actions will likely endanger *other* sources of funding that the ministry relies upon to serve at-risk youth. *Id.* ¶ 99. Grantors often ask about 71Five Ministry's successful participation in Defendants' grant program, and this successful participation has been instrumental to other foundations' and agencies' decisions to fund the ministry. *Id.* The ministry's Executive Director expects that agencies and foundations will no longer support 71Five when they learn that Defendants have disqualified the ministry from the State's grant program. *Id.*

Every day that Defendants exclude 71Five Ministries is another day that its constitutional rights are violated, its mission is curtailed, and at-risk youth are deprived of critical resources. This daily deprivation of constitutional rights "unquestionably" causes "irreparable injury." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (cleaned up). The ministry lacks an adequate remedy at law; monetary damages for Defendants' past violations cannot prevent ongoing and prospective violations. An injunction is needed to remedy ongoing and prospective constitutional violations, and to prevent lost ministry opportunities caused by Defendants' unconstitutional actions and policy.

**Balance of Equities and Public Interest.** The balance of equities and public interest also tip heavily in the 71Five's favor. "When the government is a party, these last two factors [of the injunction analysis] merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). It is "always in the public interest to prevent the violation of a party's constitutional rights." *See, e.g. Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted). And when a plaintiff has

"raised serious First Amendment questions," the balance of hardships "tips sharply in the plaintiffs' favor." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1154 (D. Or. 2020) (quoting *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007)) (cleaned up). Indeed, "the balance of equities favors [the party] whose First Amendment rights are being chilled." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

The equities and public interest favor the ministry, which has been wrongly stripped of grant awards and excluded from a government program. Oregon youth, families, and communities benefit from 71Five's efforts, and Defendants' actions needlessly curtail that work. Meanwhile, Defendants have no legitimate—much less compelling—interest in excluding the ministry simply because it prefers coreligionists, especially after years of successful participation in the grant program. Protecting the ministry's constitutional rights far outweigh any governmental interest in maintaining an unconstitutional grant rule.

## <u>CONCLUSION</u>

For these reasons, the Court should grant the motion and issue the requested preliminary injunction.

Motion for Preliminary Injunction        25

Respectfully submitted this 20th day of March, 2024,

<div style="margin-left: 40%;">

s/ Mark Lippelmann
Nathan Pogue, OR Bar No. 164611
    npogue@bittner-hahs.com
BITTNER HAHS POSTMAN SWAN
4949 Meadows Road, Suite 260
Lake Oswego, OR 97035
(503) 228-5626

David Cortman, AZ Bar No. 029490*
    dcortman@ADFLegal.org
Ryan Tucker, AZ Bar No. 034382*
    rtucker@ADFLegal.org
Jeremiah Galus, AZ Bar No. 030469*
    jgalus@ADFLegal.org
Mark Lippelmann, AZ Bar No. 036553*
    mlippelmann@ADFLegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

*Attorneys for Plaintiff*
*\*Admitted Pro Hac Vice*

</div>

Motion for Preliminary Injunction        26

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and will serve the same on counsel for Defendants via email and certified mail:

> Thomas H. Castelli
> Alex Jones
> Special Litigation Unit, Trial Division
> Oregon Department of Justice
> 100 SW Market, Portland OR 97201
> thomas.castelli@doj.state.or.us
> alex.jones@doj.state.or.us

                                                    s/ Mark Lippelmann
                                                    Mark Lippelmann

Motion for Preliminary Injunction        27

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 6,938 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.