IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

YOUTH 71FIVE MINISTRIES,

        Plaintiff,

    v.

CHARLENE WILLIAMS, *Director of the Oregon Department of Education, in her individual and official capacities*, et al,

        Defendants.

Case No. 1:24-cv-00399-CL

**OPINION AND ORDER**

---

CLARKE, Magistrate Judge.

    Plaintiff Youth 71Five Ministries brings this cause of action, alleging claims of religious discrimination against officials of the Oregon Department of Education and the Youth Development Division of Oregon. Plaintiff moves the Court for a preliminary injunction, and the Defendants move to dismiss the case based on qualified immunity. Full consent to magistrate jurisdiction was entered on March 22, 2024 (#20). For the reasons below, the motion for a preliminary injunction (#20) is DENIED, and the motion to dismiss for qualified immunity (#34) is GRANTED.

Page 1 – OPINION AND ORDER

## BACKGROUND

The Oregon Department of Education (ODE) through the Youth Development Division (YDD) provides funding for community-based youth development programs and services through the Youth Community Investment Grants. Complt. at ¶ 22 (#1). To be eligible for a grant, an applicant must meet several requirements and must submit a new application for each cycle of grants, which take place every two years or so. *See id.* at ¶ 71, 75; Detman Decl. at ¶ 13. A variety of different types of organizations are eligible, including "faith-based organizations." Complt. Ex. 9 at p. 5. For the first time, in the March 1, 2023 grant cycle, required applicants to certify that they do not discriminate in certain employment or service delivery practices. Complt. at ¶ 89; Complt. at ¶ 23. The 2023 Request for Grant Applications ("RFA") form, "Certification" states in relevant part:

> By checking boxes below applicant understands and agrees to following statements:
> …
> Applicant does not discriminate in its employment practices, vendor selection, subcontracting, or service delivery with regard to race, ethnicity, religion, age, political affiliation, gender, disability, sexual orientation, national origin, or citizenship status.

Complt. Ex. 9 at 23.

Plaintiff admits that it discriminates in its hiring practices by requiring that all employees and volunteers "subscribe and adhere without mental reservation" to a statement of Christian faith. Complt. at ¶ 45. Despite this practice, Plaintiff certified on the 2023 RFA form that it met the nondiscrimination eligibility condition for the RFA. *Id.* at ¶ 93. Based in part on this misrepresentation, YDD conditionally awarded grant funding to Plaintiff for multiple proposed programs. Detman Decl. at ¶ 17.

Months later, while finalizing the agreements for the grant funding, YDD discovered that Plaintiff's employment practices did not meet the RFA's new nondiscrimination requirement. *Id.* at ¶ 18; Hofmann Decl. at ¶ 10. YDD terminated further progress on the grant agreements and withdrew its offer to provide funding to Plaintiff's programs. *Id.* at ¶ 12; Detman Decl. at ¶ 19.

## DISCUSSION

Plaintiff seeks preliminary injunctive relief exempting it from the nondiscrimination eligibility requirement and requiring YDD to reinstate and fund the withdrawn grants. Defendants seek to dismiss Plaintiff's case on the basis of qualified immunity. For the reasons below, Plaintiff's motion is denied, and Defendants' motion is granted.

### I.   Plaintiff's motion for a preliminary injunction is denied.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). All four elements must be satisfied. *See, e.g., Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009). Here, Plaintiff cannot satisfy any of the four elements to be entitled to a preliminary injunction.

#### A. Plaintiff has not established that it is likely to succeed on the merits.

Plaintiff's lawsuit claims that the YDD's nondiscrimination requirement violates the Free Exercise and Free Speech clauses of the First Amendment, as well as the ministerial exception

and church autonomy doctrine under the religion clauses of the First Amendment. Complt. at ¶¶ 145-183 (#1). Plaintiff is not likely to succeed on these claims.

### 1. Plaintiff cannot show a likelihood of success on the merits of its Free Exercise claims.

The Free Exercise and Establishment Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. The Free Exercise Clause prohibits government action that is "hostile to the religious beliefs of affected citizens . . . and that passes judgment upon or presupposes the illegitimacy of religious beliefs or practices." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). Indeed, "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990) ("*Smith*").[1] "A State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits" because of their "religious character" or "religious exercise." *Carson v. Makin*, 596 U.S. 767, 778–81 (2022).

However, while the constitution protects sincerely held religious beliefs, it does not guarantee an unlimited right to religious practice. *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (weighing sincerely held religious beliefs against penological interests). "[T]he right of

---

[1] In the aftermath of the *Smith* decision, Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) and its sister statute the Religious Freedom Restoration Act of 1993 (RFRA). *Ramirez v. Collier*, 595 U.S. 411, 424, 142 S. Ct. 1264, 1277, 212 L. Ed. 2d 262 (2022). Both statutes aim to ensure "greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357, 135 S. Ct. 853, 860, 190 L. Ed. 2d 747 (2015). Neither statute is applicable to the issues in this case.

free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability[.]" *Smith*, 494 U.S. at 879 (quotation marks omitted).

The Court finds that Plaintiff is unlikely to succeed on the merits of its Free Exercise claims because the nondiscrimination requirement is neutral and generally applicable and because YDD did not excluded Plaintiff from grant funding "solely because of religious character or exercise."

### a. Defendants' nondiscrimination requirement is a valid and neutral law of general applicability.

As stated above, *Smith* held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause, so long as they are neutral and generally applicable. 494 U.S. at 879. Plaintiff concedes that the nondiscrimination requirement is facially neutral, but it argues that it is not generally applicable.

"Broadly speaking, there are two ways a law is not generally applicable." *Tingley v. Ferguson*, 47 F.4th 1055, 1087–88 (9th Cir. 2022) (citing *Fulton*, 593 U.S. at 533). "The first is if there is a 'formal mechanism for granting exceptions' that 'invite[s] the government to consider the particular reasons for a person's conduct.'" *Id.* (citing *Fulton*, 593 U.S. at 537). "The second is if the law 'prohibits religious conduct while permitting secular conduct' that also works against the government's interest in enacting the law." *Id.* at 1088 (citing *Fulton*, 593 U.S. at 534). If neither applies, the law is generally applicable. *See id.* 8 882.

First, here, there is no formal or informal mechanism for granting exceptions to the nondiscrimination requirement at all, let alone one that invites the government to consider particular reasons for a person's conduct. Each applicant "must complete and submit all Applicant Information and Certification information," including the certification that the "Applicant does not discriminate in its employment practices, vendor selection, subcontracting,

or service delivery with regard to race, ethnicity, religion, age, political affiliation, gender, disability, sexual orientation, national origin or citizenship status." Complt. Ex. 9 at 13 (RFA, "Application Requirements," including the "Applicant Information and Certification Sheet"); Complt. Ex. 7 at 23 (Plaintiff's application, "Certification" section). If the application does not comply with all Application Requirements, including submission of the nondiscrimination certification, it is deemed "non-responsive," and it does not proceed to the "evaluation" stage. *See* Complt. Ex. 9 at 17 ("Responsive Applications meeting the requirements outlined in the Application Requirements section will be evaluated by an Evaluation Committee."). No waiver of this certification exists. Plaintiff's own allegations state that "a failure to check the box on the electronic-only application would have caused 71Five's application to be 'considered non-responsive,' meaning it would 'not be considered further.'" Complt. ¶ 95. Thus, even on the face of the Complaint, the RFA does not permit applicants to opt out of the nondiscrimination requirement for any reason.

Second, Plaintiff argues in its Reply Brief that YDD permits secular conduct as an exception to the nondiscrimination requirement by "allow[ing] many successful applicants to openly discriminate in the provision of services based on race, ethnicity, gender, and national origin." Plf. Reply pg. 8. Plaintiff gives the following examples, among others:

> Defendants awarded $220,000 to Ophelia's Place even though its mission is limited to helping girls.
>
> Defendants awarded $220,000 to the Black Parent Initiative even though its youth programs "serve African and African American families with children."
>
> Defendants awarded $560,000 to the CAPECES Leadership Institute even though its website lists "[w]ho we serve & work with" as "Latin/e/o/a/x, immigrant, Indigena, Afrodescendiente, and farmworker children, youth, adults, and elders in rural and urban

> communities of the Mid-Willamette Valley (Marion, Polk, Yamhill)."
>
> Defendants awarded $75,479 to the Center for African Immigrants and Refugees Organization (CAIRO) even though its mission is to offer "programs, services, community organizing and collaborative leadership that create equitable opportunities for African refugees and immigrant children, youth and families to thrive."

*Id.* Plaintiff cites to these organizations' public websites as evidence of these allegations in support of their argument that secular "discrimination" is permitted in the provision of services. The Court does not find this argument persuasive for three reasons.

First, Plaintiff only raised this argument in its Reply brief, depriving Defendants of the opportunity to substantively respond. Second, Plaintiff fails to allege these facts in the Complaint, thus failing to provide notice pleading as required by the federal rules and, again, depriving Defendants of notice and an opportunity to respond. Third, even if the facts alleged in Plaintiff's Reply were properly at issue before the Court in either the Complaint or the Plaintiff's Motion, none of the allegations allow the Court to find that simply directing an organization's services to particular demographics in the community, in culturally responsive ways, constitutes "discrimination" as contemplated by the nondiscrimination clause. For instance, there is no evidence or even an allegation that people who fall outside the target demographics of each organization are refused services for discriminator reasons or are otherwise unlawfully excluded. Similarly, there is no evidence or allegation that any other organization or successful grant

applicant discriminates in its hiring practices. By contrast, Plaintiff admits that it discriminates by refusing to hire employees who do not sign an attestation of faith.

Neither of the *Tingley* factors apply here. The nondiscrimination requirement is neutral and generally applicable and, therefore, it is not subject to strict scrutiny.

### b. Defendants' nondiscrimination requirement does not turn on an applicant's religious character or religious exercise.

Plaintiff argues that the nondiscrimination requirement should be struck down based on a similarity to the funding restrictions that were struck down in the *Trinity Lutheran* line of cases. The Court disagrees.

In the *Trinity Lutheran* line of cases, the Supreme Court struck down funding restrictions that categorically denied benefits to certain institutions based solely on the religious character of the institutions or their religious activities. In *Trinity Lutheran*, the Court held that a church could not be excluded from a public benefit "solely because it [was] a church." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017). In *Espinoza*, the Court held that a state could not impose a "categorical ban" on aid to "religious schools," "solely because they are religious." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 485, 487 (2020). Similarly, in *Carson*, the Court struck down a funding restriction that "rigidly exclude[d] any and all sectarian schools." *Carson*, 596 U.S. at 781. In all three cases, the Court concluded that the funding restrictions excluded recipients "solely because of their religious character." *Id.* at 780 (quoting *Trinity Lutheran*, 582 U.S. at 462); *Espinoza*, 591 U.S. at 487 (same). The Court in *Carson* also made clear that excluding a recipient based on how they would use the funding – *i.e.*, for religious purposes, was not a proper distinction. 596 U.S. at 788 ("In short, the prohibition on

status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination").

Here, YDD's grant program does not exclude applicants based on the religious character of the applicants or the religious use of the funds being granted. Plaintiff alleges that four other faith-based organizations received grants under the program the same year that Plaintiff's application was denied. Complt. ¶ 101–02. The nondiscrimination requirement did not disqualify those organizations because those organizations do not discriminate in their employment practices with regard to any of the listed characteristics. *See* Complt. ¶ 103.

Plaintiff's own application experience demonstrates that the denial of funding had nothing to do with Plaintiff's religious character or its planned use of the funds – both of these factors were known to the agency during the entire pendency of Plaintiff's application, and neither factor precluded an award of funding. It is clear from the face of the Complaint that Plaintiff was disqualified and the funding was denied because Plaintiff discriminates in its employment practices. Complt. ¶ 90. Unlike any of the *Trinity Lutheran* line of cases, Plaintiff was not denied funding or eligibility because of its religious character or its use of funds.

### 2. Plaintiff cannot show a likelihood of success on the merits of its church autonomy claims.

Plaintiff's church autonomy claims are unlikely to succeed on the merits because the church autonomy doctrine is an affirmative defense. Therefore, these claims fail to state a cognizable claim for relief.

Courts have held that churches have autonomy in making decisions regarding their own internal affairs. This "church autonomy doctrine" prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity. *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116–17, 73 S.Ct. 143, 97 L.Ed. 120 (1952). The doctrine is

rooted in the First Amendment's Free Exercise and Establishment Clauses. *Bollard v. Cal. Province of the Soc'y of Jesus*, 211 F.3d 1331, 1332 (9th Cir. 2000) (order denying rehearing en banc) (Wardlaw, J., dissenting) ("Though the concept originated through application of the Free Exercise Clause, the Supreme Court has held that the Establishment Clause also protects church autonomy in internal religious matters."). The doctrine is also rooted in "a long line of Supreme Court cases that affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C.Cir.1996) (quoting *Kedroff*, 344 U.S. at 116, 73 S.Ct. 143).

The principles articulated in the church autonomy line of cases also apply to civil rights cases. For example, courts have recognized a ministerial exception that prevents adjudication of Title VII employment discrimination cases brought by ministers against churches. *E.g., EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C.Cir.1996); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.1972). *See also Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1168 (4th Cir.1985) (The right to choose ministers is an important part of internal church governance and can be essential to the well-being of a church, "for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large").

However, the church autonomy doctrine, or ministerial exception, is an affirmative defense against suit by a disgruntled church employee, not a standalone right that can be wielded against a state agency. *See Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017) ("The ministerial exception is an affirmative defense") (internal citations omitted). Not a single case in the

precedent discussed above expanded the church autonomy doctrine into an affirmative claim.[2] In other words, while the church autonomy doctrine may be used as a shield, it has not been allowed to be used as a sword. These claims therefore fail to state a cognizable claim for relief and are unlikely to succeed on the merits.

### 3. Plaintiff is seeking a mandatory injunction, which is disfavored by the courts and results in a higher burden.

Finally, even if Plaintiff could show a likelihood of success on the merits, the mandatory injunction that it seeks requires an even higher burden. Mandatory injunctions are "particularly disfavored," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and place a higher burden on the plaintiff to show not only that he is likely to succeed on the merits, but also that "the facts and law clearly favor the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (cleaned up).

The distinction between the two types of injunctions[, mandatory vs. prohibitory,] can fairly be categorized as one of action versus inaction. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (citing *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014). "A mandatory injunction orders a responsible party to take action, while [a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Ariz. Dream*, 757 F.3d at 1060 (cleaned up)). The difference is legally significant because mandatory

---

[2] Plaintiff cites to two out-of-Circuit cases to support its church autonomy claims. In *Darren Patterson Christian Academy*, the plaintiff won a preliminary injunction by default: the court concluded that the plaintiff was likely to succeed on the merits when the defendants made no substantive arguments on the merits, and the court declined to "make [the] [d]efendants' arguments for them." *Darren Patterson Christian Academy v. Roy*, 2023 WL 7270874, at *14-15 (D. Colo. Oct 20, 2023). In *InterVarsity*, the court acknowledged that a claim based on the ministerial exception was "novel" and that it was "unclear" whether such a claim could be brought at all. *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 413 F.Supp.3d 687, 694 (E.D. Mich. 2019). Neither opinion is binding on this Court, and this Court does not find the reasoning in either case to be persuasive or applicable here.

injunctions are "particularly disfavored," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and place a higher burden on the plaintiff to show "the facts and law clearly favor the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (cleaned up).

The inquiry is whether the party seeking the injunction seeks to alter or maintain the status quo. *Fellowship of Christian Athletes,* 82 F.4th at (citing *Arizona Dream,* 757 F.3d at 1060-61 (9th Cir. 2014)). The status quo refers to "the legally relevant relationship between the parties before the controversy arose," *id.* (emphasis omitted), or "to the last uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000).

Here, Plaintiff argues that it seeks "to reinstate the last uncontested status, when the ministry was participating in the grant program and had two awards for the 2023-2025 grant cycle." Plf Reply (#35) p.2. However, this characterization of "the last uncontested status" ignores the undisputed timing of the events at issue. The policy change that implemented the nondiscrimination requirement took place at the beginning of the 2023 RFA grant cycle, on March 1, 2023. Plaintiff did not contest the policy at the time of application.[3] Instead, Plaintiff certified compliance with the new policy and proceeded to file an application notwithstanding

---

[3] It is possible that, if Plaintiff had filed this lawsuit at the time of application, seeking only eligibility to apply for the grant, the outcome might have been different. Essentially, Plaintiff could have argued that the "last uncontested status" was that it was eligible for the grant, as it had been in years past, and therefore a preliminary injunction would merely preserve the status quo of prior eligibility. This would have been similar to the plaintiffs in *Arizona Dream Act Coalition*, who became suddenly ineligible for a driver's license due to a new policy requirement. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014). However, in that case, the plaintiffs were simply challenging their change in eligibility status; they were not asking the court to affirmatively award them a driver's license. *See id.* Here, Plaintiff does not merely challenge eligibility, it requests an affirmative award of an individual grant. This posture is distinguishable from *Arizona Dream*. Plaintiff also missed the chance to make this argument by waiting until after the grant had been denied because now Plaintiff's status as eligible is no longer the status quo. Thus, the case at bar is distinguishable both for the timing and for the substance of the requested injunction.

Plaintiff's true employment practices. Plaintiff did not contest YDD's policy until the grant funding was denied. At that time, Plaintiff was clearly ineligible for the grant under the terms of the RFA, and had been for many months, no Grant Agreement had been entered, and YDD had not finalized the award or disbursed any of the funds. Therefore, restoring the "status quo" or the "last uncontested status prior to the controversy" would not grant Plaintiff the relief it seeks.

Additionally, Plaintiff concedes that YDD "may need to perform several actions" if the preliminary injunction is granted. In fact, Plaintiff does not dispute Defendants' contention that granting the motion would require the following steps to award the grants to Plaintiff: the Procurement department would have to negotiate the proper Grant Agreements, which are negotiated prior to each award being finalized. Assuming such agreements could be negotiated, funds would have to be disbursed to Plaintiff that have already been awarded to another applicant and fully allocated under Grant Agreements that already exist. This would require YDD to add additional funds to the grant programs and then, over time, disburse it to Plaintiffs. Def. Resp. (#31) p. 31. Mandating all of these actions would require imposing a mandatory injunction. This results in a higher burden on Plaintiff. Plaintiff must show not only a likelihood of success on the merits, but also that "the facts and law clearly favor" Plaintiff's claims. For all of the reasons already discussed, Plaintiff cannot do so.

### B. Plaintiff has not alleged irreparable harm.

First, "monetary injury is not normally considered irreparable." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Nonetheless, "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). As the Second Circuit has explained, "[t]he loss of ... an ongoing business representing many years of

effort and the livelihood of its ... owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam). Thus, showing a threat of "extinction" is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable. *Am. Passage Media Corp.*, 750 F.2d at 1474.

Here, Plaintiff has alleged monetary damage, but not extinction of the organization:

> 71Five Ministries cannot get through the 2-year grant cycle without reducing its programs, staff, or both. Amundsen Decl. ¶ 97. As a direct result of Defendants' actions, 71Five staff have already had to take time away from mission-critical programs to focus on fundraising. *Id.* ¶ 96. This reduction of mission-critical work will continue without an injunction. *Id.* And Defendants' actions will likely affect 71Five's ability to pay its employees, some of whom had their salaries partially funded by previous grants awarded by Defendants. *Id.* ¶ 98.

Plf. Mtn. Prelim. Inj. (#20) p. 24. Without the threat of complete closure of the organization, Plaintiff has not alleged monetary damage that constitutes irreparable harm.

Second, other courts in this district have determined that the alleged unequal treatment of a plaintiff's grant funding application "constitutes a discrete past harm." *Cocina Cultura LLC v. Oregon*, 2020 WL 7181584, at *2 (D. Or. Dec. 7, 2020) (citing *Great N. Res., Inc. v. Coba*, 2020 WL 6820793, at *2 (D. Or. Nov. 20, 2020) ("Plaintiff applied for a grant from the Oregon Cares Fund, which applicants know they may only apply for once."). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, ... if

Page 14 – OPINION AND ORDER

unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

Here, Plaintiff faced the alleged unconstitutional barrier when it its application for a grant was denied on November 14, 2023. Complt. at ¶¶112-113. Plaintiff's alleged constitutional harm therefore occurred on that date. Defendants have submitted evidence stating that the grant funds allocated for Plaintiff's application were awarded to the next highest scoring applicants eligible for the grants: "all of those funds have been allocated to those grant awardees and are subject to Grant Agreements." Detman Decl. at ¶ 20; Hofmann Decl. at ¶ 16. Some of the funds have been disbursed in reimbursement for project expenses. Detman Decl. at ¶ 20.

By contrast, Plaintiff has not proffered any evidence or allegation that it is experiencing, or will likely experience, any on-going harm or damage to constitute irreparable injury. Plaintiff's only allegations in this regard state:

> Grantors often ask about 71Five Ministry's successful participation in Defendants' grant program, and this successful participation has been instrumental to other foundations' and agencies' decisions to fund the ministry. [Amundsen Decl. 98.] The ministry's Executive Director expects that agencies and foundations will no longer support 71Five when they learn that Defendants have disqualified the ministry from the State's grant program. *Id.*

Plf. Mtn P.I. (#20) at 23. The Executive Director's "belief" about what might happen with other grantors and funders is insufficient to state a claim for an ongoing or irreparable injury. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250–51 (9th Cir. 2013) (explaining that "[t]hose seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm").

Plaintiff's claims of irreparable harm are further undercut by its delay in seeking relief. *See Cocina Cultura LLC*, 2020 WL 7181584, at *4 ("Plaintiff's nearly three-month delay in

seeking injunctive relief "implies a lack of urgency and irreparable harm.")."A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights, a plaintiff demonstrates the lack of need for speedy action." *Lydo Enters., Inv. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)).

Here, Plaintiff's application for a grant was denied on November 14, 2023. This lawsuit was filed on March 4, 2024, and the motion for the preliminary injunction was filed on March 20, 2024. Plaintiff's four-month delay in seeking injunctive relief demonstrates a lack of urgency and a lack of irreparable harm.

### C. The balance of equities and the public interest do not weigh in favor of an injunction.

"When the government is a party, these last two factors [of the injunction analysis] merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). It is "always in the public interest to prevent the violation of a party's constitutional rights." *See, e.g., Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted). However, in this case, the balance of equities and public interest do not weigh in favor of the Plaintiff. Plaintiff's requested relief asks the Court to require the YDD to enter into an agreement with Plaintiff for grant funding, to disburse money, and to engage in multiple steps to monitor a currently unfunded grant award. The grant funds that Plaintiff seeks have already been awarded and allocated to other applicants. This type of mandatory injunction is disfavored by the courts. Considering the lack of urgency, the failure to show irreparable harm, and the failure to show a likelihood success

on the merits, the balance of equities and public interest here weigh in favor of denying the injunction.

## II.   Defendants are entitled to qualified immunity.

Qualified immunity shields government officials from section 1983 liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation, and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201, (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier's* requirement that qualified immunity analysis proceeds in a particular sequence). The right must have been clearly established at the time of the defendant's alleged misconduct, so that reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Courts have discretion in deciding which prong to address first, depending on the circumstances of the case. *Pearson*, 555 U.S. at 242-43.

In this case, the Court has already determined that Plaintiff is unlikely to succeed on the merits of their claims because the nondiscrimination clause is neutral and generally applicable and does not turn on Plaintiff's religious exercise, and because there is no precedent determining that a religious organization's right to use discriminatory employment practices can be the basis for an affirmative claim against a government agency who denies grant funding for that reason. Lacking such a precedent, and lacking clarity as to whether a constitutional violation even exists here, the Court finds that the rights claimed by the Plaintiff are not "clearly established," such

that Defendants should have known that requiring grant applicants to certify nondiscriminatory employment practices could be a constitutional violation.

## ORDER

For the foregoing reasons, Defendants' Motion to Dismiss (#34) is granted, and Plaintiff's Motion for a Preliminary Injunction (#20) is denied. Defendants are entitled to qualified immunity. Plaintiff's Complaint is dismissed with prejudice. Judgement shall be entered for the Defendants.

DATED this __26__ day of June, 2024.

_____
MARK D. CLARKE
United States Magistrate Judge